Henry E. CROWE et al., Co-Executors
Etc., Defendants, Appellants,

v.

Clorinda DI MANNO, Plaintiff, Appellee.

No. 4916.

United States Court of Appeals
First Circuit.

Sept. 15, 1955.

Stanley M. Epstein, Boston, Mass., and Francis J. Maguire, Providence, R. I., appearing specially, Andrew B. Goodspeed and Willard, Petersen, Goodspeed & Cameron, Boston, Mass., on the brief, for appellants.

Walter R. Morris and J. Newton Esdaile, Boston, Mass., for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment for the plaintiff in an action for personal injuries resulting from a collision between an automobile operated by the plaintiff and a tractor-trailer unit owned by the defendants as co-executors which was being operated at the time of the accident by their servant in the regular course of his employment. The plaintiff is a citizen of Massachusetts and the defendants are citizens of Rhode Island who, as co-executors duly appointed by the Probate Court of the City of Pawtucket, Rhode Island, have since 1947 been carrying on the interstate trucking business of their decedent, Robert A. Watt, formerly a citizen of that state. There is not the slightest doubt that the matter in controversy far exceeds the sum or value of $3,000, exclusive of interest and costs, for the plaintiff's right leg was so badly mangled in the accident that within an hour or two it had to be amputated a little above the knee and a few days later it had to be amputated again just below the hip. A trial by jury lasting twelve days resulted in a verdict for the plaintiff in the amount of $150,-000 and this appeal is from the judgment entered on that verdict.

We are confronted at the outset with a question of the defendants-appellants' capacity to be sued in Massachusetts which was raised in this court for the first time by a motion to vacate the judgment below and remand the cause for dismissal. The appellants' argument is that as the executors of a Rhode Island citizen appointed by a Rhode Island probate court they lack capacity to be sued in their fiduciary capacity in Massachusetts. Wherefore they say that since the plaintiff's action was brought against them as co-executors it ought now to be dismissed out of hand even though without objection they appeared and defended the action on the merits in the court below. We do not agree.

It is certainly true that the defendants' authority to administer their decedent's estate derives from their appointment as co-executors by a Rhode Island court, and it is equally true that an executor or administrator has no authority to act as such outside the state wherein he was appointed. But a decedent's estate is not a legal entity. Rights of action against the estates of deceased persons can be asserted only against the individual or individuals administering the estate. The question here is whether this action lies against the co-executors in their fiduciary capacity or lies against them personally.

Counsel agree that Rule 17(b), Fed.Rules Civ.Proc., 28 U.S.C.A., requires that the question of the capacity in which the defendants must be sued in

the court below be determined by the law of Massachusetts, and the settled rule in Massachusetts, as in Rhode Island, Parmenter v. Barstow, 1900, 22 R.I. 245, 47 A. 365, 63 L.R.A. 227 and generally elsewhere, is that executors and others in similar positions of trust are liable and must be sued personally, not in their fiduciary capacities, for torts committed in the course of their administration either by themselves or by their agents or servants when acting within the scope of their employment. Shepard v. Creamer, Trustee, 1894, 160 Mass. 496, 36 N. E. 475; Restatement, Trusts § 264. And the fact that defendants are named in the complaint as co-executors doing business etc., is immaterial, for the case cited last above also stands for the proposition that naming a defendant in the complaint or other papers in the case in his fiduciary capacity is merely *descriptio personae* and may be disregarded as surplusage. Since the plaintiff is a citizen of Massachusetts and the defendants are both citizens of Rhode Island, and since the requisite jurisdictional amount is clearly in controversy, we think there can be no doubt on the score of federal jurisdiction.

We turn now to the merits of this appeal.

The accident occurred at a point on U. S. Route 1, an undivided four-lane highway, near its intersection with Carroll Avenue in the town of Westwood, Massachusetts, at about 4:15 a. m. on November 25, 1952. Both vehicles involved in the accident were traveling on Route 1 in a northerly direction toward Boston. The plaintiff's version of the accident and of the events leading up to it is that she left Pawtucket, Rhode Island, bound for Boston some time after 3:00 o'clock in the morning of the day of the accident driving a sedan with a young man sitting beside her on the front seat. As she was driving north on Route 1 in Westwood she overtook and passed the defendants' tractor-trailer unit somewhere south of the intersection of East Street, which is a short distance south of the Carroll Avenue inter-section. She says that she slowed down to about 20 miles per hour for the East Street intersection, passed through it safely, and had just begun to increase her speed again when the car she was driving was struck violently from behind by the front of the defendants' tractor. She says this caused her car to spin to its left out of control and make an approximately 180° turn so that it faced back in the direction from which it had come. While in this position she says that the tractor struck her car again, this time on its left front corner, turning it back in the direction of Boston. This second impact she says threw her against the front door on her side of the car so violently that it flew open and she fell to the road where a dual wheel of the tractor-trailer unit ran over her right leg and crushed it so badly at the knee as almost to tear it from her body.

The defendants' concede the plaintiff's severe injury but their version of the accident is quite different. They introduced evidence tending to show that as their unit approached the intersection of East Street it was in the extreme easterly lane of Route 1 proceeding at a speed somewhat less than 40 miles per hour, and that the car driven by the plaintiff in attempting to pass at a very high rate of speed sideswiped the tractor just back of its left front wheel crumpling the running board on that side, punching a hole in the cab door, and doing other damage in that area. Their driver said that the sedan then went on up the road out of control but was not struck a second time and that as it went up the road the plaintiff fell out, and in some way, he did not profess to say exactly how, received the severe injury of which she complains.

There is evidence to support both versions of the event. Indeed, it is very difficult to say which version is more nearly correct for the damage done to the vehicles involved is not wholly consistent with either. We do not need to analyze the evidence in minute detail for the defendants do not contend that they are entitled to a directed verdict. Their pri-

mary contention is that the unfair conduct of the District Judge throughout the trial so seriously prejudiced them in presenting their case to the jury that they were deprived of their right to a fair and impartial trial. The charge is a serious one and has been carefully considered. We regret to say that we find it amply supported.

Both sides were represented at the trial by obviously able and experienced counsel. Nevertheless the District Judge participated very actively in the trial from beginning to end. Indeed, relatively few pages of the nearly 800 printed pages of testimony in the record appendix are without some question to a witness, comment on the evidence, or remark by the court. Standing alone the judge's active participation would not be objectionable. Trial courts traditionally have the power to question witnesses to elicit facts not developed by counsel or to clarify testimony previously given. And in the federal courts a trial judge is not a mere moderator but may if he chooses comment on the weight of the evidence, and express his opinion upon the facts, provided in the first place that he does so fairly, impartially and accurately, and provided in the second place that he makes it clear to the jury that his comments are only advisory, and that all matters of fact are for their determination and theirs alone. Quercia v. United States, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321.

The prerogative of the trial judge to comment on the evidence has definite boundaries. They are clearly traced in the opinion last cited in 289 U.S. at page 470, 53 S.Ct. at page 699, where Mr. Chief Justice Hughes speaking for a unanimous Court said:

"This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.' Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841; Hickory v. United States, 160 U.S. 408, 421–423, 16 S.Ct. 327, 332, 40 L.Ed. 474. * * * "

Furthermore, in the Quercia case, 289 U.S. at page 472, 53 S.Ct. 698, it is held that an error of the trial court in overstepping the bounds of its privilege to comment on the evidence is not cured by a statement in the charge that the court's opinion is only advisory and not binding on the jury. That admonition is always necessary. At the most it can offset only brief and minor departures from strict judicial impartiality. See United States v. Brandt, 2 Cir., 1952, 196 F.2d 653, 655, 656.

The cases cited above are both criminal. We have no doubt, however, that the principles enunciated in them apply as well to civil cases. No trial in court is ever a purely private controversy in which the public has no interest. "The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence."

N. Y. Central R. R. Co. v. Johnson, 1929, 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706.

Any attempt to catalogue every instance of prejudice to the defendants interjected into this case by the trial judge, either in his comments on the evidence, in his obviously hostile cross-examination of witnesses whose testimony was unfavorable to the plaintiff, but not of witnesses who testified in the plaintiff's favor, or in various other ways, would expand this opinion to inordinate length. A few specific instances will have to suffice.

The speed at which the plaintiff's car was travelling at the time of the accident was, of course, a vitally important issue in the case. She testified that she was driving at a rate of speed that certainly would be considered reasonable under the circumstances. But her testimony stood pretty much alone for it was not corroborated by her companion because he said he was asleep and woke up only when the vehicles collided. Nor could the driver of the defendants' truck throw much light on the issue. All he could say was that he happened to glance in his rear-view mirror just before the collision where he saw the lights of the overtaking car only as a flash just before the impact. Substantial evidence of excessive speed on the plaintiff's part, however, was elicited from the Chief of Police of Westwood who was subpoenaed by both sides but first called to the stand by the plaintiff. He testified that with the permission of one of the attending physicians he and one of his sergeants visited the plaintiff in the hospital about 5 o'clock in the afternoon of the day after the accident. He said that when asked about her speed the plaintiff stated, without committing herself as to who was driving,[1] that "they were travelling at a fast rate of speed," that when she was asked what she meant by a "fast rate of

speed" she said "about 75 miles per hour," and that when she was asked if she realized what 75 miles per hour was, she said that she did and that "they were travelling at a very fast rate of speed, going as fast as the car would go." At that point in the interview the chief said that the plaintiff showed signs of pain and asked them to leave and they did. The chief's testimony was corroborated by the sergeant who was put on the stand by the defendants.

Confronted with this damaging testimony, counsel for the plaintiff resorted to the time-honored device of distracting the jury's attention from it by trying the policemen. In his cross-examination of the sergeant, and also in his cross-examination by leave of court of his own witness, the chief, he sought to convey the impression to the jury that the officers had been guilty of a heartless, callous, and cruel act to visit the plaintiff in the hospital to inquire about the accident so soon after she had lost her leg. Furthermore, he implied by his questioning that their testimony could well be mistaken for the reason that neither had written down what the plaintiff said at the time of the interview but that only the chief wrote up a report of the interview and that he did so from memory some time later.

Plaintiff's counsel was within his rights in adopting the tactic of trying the police officers. But it was not within the court's prerogative to do likewise by subjecting both police officers to hostile cross-examination. The following incident, which occurred during direct examination of the police sergeant, is typical of many.

"Q. Can you describe her speech as to whether it was coherent or incoherent, or in any form of words?
A. I would say she was coherent.
"Q. What do you mean coherent?

---

[1]. The plaintiff admitted on the stand that she had been the driver of the sedan but her companion testified that immediately after the accident, while the plaintiff was still lying in the roadway, she asked him to tell the police that he had been driving, that he agreed to do so, and did so, but later changed his story.

"Mr. Goodspeed: Me or the witness?

"The Court: Oh, no. Do you want this jury to understand you mean by coherent that this girl who had her leg taken off, who was under the influence of sedatives, as the testimony is, was apparently in a position where she knew what she was saying and could understand what you were saying? Is that it?

"The Witness: Yes, your Honor.

"The Court: All right.

"Q. Was there any indication to the contrary?

"The Court: Wait a minute, it is for the jury.

"Mr. Goodspeed: Do you exclude my question?

"The Court: There was everything to indicate to the contrary and pro, let the jury pass on it."

And not content with cross-examining the police officers themselves, the court attempted to discredit them still further as shown by the following excerpts from the direct examination of one of the two doctors who had treated the plaintiff at the hospital immediately after the accident.[2]

"Q. Do you consider it, Doctor, from your experience, a humane thing for a chief of police under these circumstances to question a girl?

"Mr. Goodspeed: I object. It is obviously objectionable.

"Mr. Esdaile: Strike it out.

"The Court: I will allow the question.

"Mr. Esdaile: No, I don't want any—

"The Court: She was in danger of dying, wasn't she, that afternoon?

"The Witness: Yes, sir.

"The Court: No doubt about it?

"The Witness: Yes, sir.

"The Court: She was in grave danger of dying; isn't that the way to put it?

"The Witness: Yes, sir.

\*      \*      \*      \*      \*

"Q. Then, Doctor, assume that on the afternoon of the 26th Chief Morrison had asked you for permission to interview this girl, in the condition she was in, can you tell the jury, having in mind her condition, whether or not you would have allowed that interview at that time?

"Mr. Goodspeed: My objection.

"The Court: I will allow it. He was the doctor taking care of her. She was under narcotics, and he described her condition.

"The Witness: I might put it this way, you could do it—

"The Court: But it wouldn't be good medical practice to permit that?

"The Witness: No.

"Q. Why not? A. Well, it would be—she wouldn't be able to tell you much, and what she might say you couldn't put too much credence in it, because she is not herself.

"The Court: Wouldn't that excitement be sufficient to set her back, and maybe cause her death? That is right, isn't it?

"The Witness: Yes, sir."

Furthermore, the trial judge, not only in his charge but also repeatedly during the taking of testimony, found occasion to comment disparagingly on the police officers' evidence of the plaintiff's excessive speed. He even went so far as to interrupt counsel for the defendants during his argument to the jury to interject the following:

"The Court: The only evidence of 75 miles an hour, Madam Forelady

---

2. The other doctor, who was the one who gave the Chief of Police permission to interview the plaintiff, had entered the military service and was not available as a witness.

and ladies and gentlemen of the jury—and I say this with no desire to interpose—is the testimony of the Chief of Police and the sergeant, who saw that young lady on the afternoon of the day she was operated on, when she was under anesthesia, and when she finally told them to get out.

"That is the only evidence, and if there is any other, I would like to have counsel call it to my attention. The evidence of 75 miles an hour came from their lips, and they say she told that. Of course, if she did tell that, it is your duty to consider it, but that is the only evidence."

This remark was not only uncalled for, since plaintiff's counsel had not objected to anything said by defendants' counsel in his argument, but it was also prejudicially inaccurate in two important respects. The police officers did not visit the plaintiff "on the afternoon of the day she was operated on," they visited her about 5 o'clock in the afternoon of the next day, that is to say, about 36 hours after her first operation, and, although there is evidence that she had been given a sedative earlier that afternoon, there is no evidence at all that when the officers called "she was under anesthesia."

The foregoing erroneous statements of fact are enough to warrant a new trial but another matter requires specific comment.

Early in the trial, when counsel for the defendants objected to a question put to a witness by counsel for the plaintiff on the ground that it was leading and counsel for the plaintiff offered to withdraw it the court said:

"No, no, I will permit it. Whether a question is leading is a matter for the Court, and I am very, very generous about that, and the only time I ever exclude it is when I am satisfied that either counsel is trying to commit a fraud upon the Court, and I don't consider that with either one of you two attorneys—you wouldn't even think of it. So I am permitting it. It's within my discretion, and I'm going to order the question answered."

This lenient attitude toward leading questions obtained while the plaintiff's case was going in with the result that plaintiff's counsel was allowed over defendants' objection to enquire of several of his witnesses whether certain dents and scratches they observed on the vehicles involved were "fresh." But when the defendants' case was going in the judge's attitude underwent a marked change, for on his own initiative he excluded like questions put by defendants' counsel on direct examination as the following excerpt from the testimony of one of the defendants' mechanics clearly indicates:

"Q. Did you see any fresh marks of damage to the front of the front bumper? A. I did not.

"The Court: Don't you think that is an unfair way of asking that question?

"Mr. Goodspeed: A lot of other witnesses have been asked the same question.

"The Court: I will exclude that question and answer, the jury will disregard it. That is clearly putting those words right into the mouth of that man. Let him describe it. I have no objection to that.

"Mr. Goodspeed: My objection to your Honor's comments.

"The Court: I do not want you to ask any more of those questions."

Projected against this background the trial judge's frequent protestations of fairness and impartiality in his rulings, matters which should be so evident as not to require mention, to say nothing of reiteration, sound hollow indeed. Furthermore, such remarks serve to emphasize the prejudice to the defendants of the rulings against them which purport to rest on an exercise of the court's discretion.

■ We could prolong this opinion to great length by the citation of many other instances of unfairness to the defendants on the part of the trial judge. To do so, however, would serve no useful purpose. It will be enough to remark in summary that it goes without saying that in all cases, and particularly in cases such as this involving the pathetic dismemberment of a young woman of twenty, it is the trial judge's most solemn duty to see that the defendant has a fair opportunity to present his side of the case to the jury. After all, heart moving as a plaintiff's injuries may be, they may not have been caused by the defendant's fault. In this case Judge McCarthy signally failed in his duty. For, in addition to the instances of unfair conduct already mentioned, he, figuratively speaking, stepped down from the bench to assume the role of advocate for the plaintiff. And in that role he repeatedly exceeded the proper bounds of advocacy by asking witnesses not merely highly argumentative questions, but questions so leading as not really to be questions at all but statements of fact, often incomplete or distorted at least in emphasis and consistently slanted in the plaintiff's favor, which he followed by "Didn't you?" "Isn't that right?" or some similar phrase. In short, the record indicates that the judge throughout the trial openly exhibited a partisan zeal for the plaintiff wholly out of keeping with his office which deprived the defendants of their fundamental right to a fair and impartial trial. We must order a new trial before another judge.

The matter of costs on this appeal remains for disposition.

■ On a few occasions counsel for the plaintiff perhaps went too far in slipping prejudicial innuendoes into his questions on cross-examination by the use of the negative pregnant, and then promptly withdrawing his question when counsel for the defendants objected; a tactic, by the way, which provoked no word of criticism from the court. But we are not vacating the judgment below for any misconduct of counsel for the plaintiff. We are vacating it for repeated acts of misconduct by the trial judge and in this situation we do not think the plaintiff-appellee should be charged with costs in this court.

The judgment of the District Court is vacated and set aside and the case is remanded to that court for a new trial before another judge; no costs.