Burton S. KNAPP et al., Appellants,

v.

John P. KINSEY et al., Appellees.

No. 12676.

United States Court of Appeals
Sixth Circuit.

May 1, 1956.

Richard Ford and Charles H. King, Detroit, Mich. (Kenneth B. McConnell, Fischer, Sprague, Franklin & Ford, Detroit, Mich., on the brief for voting trustees; Arthur W. Sempliner, Detroit, Mich., on the brief for Burton S. Knapp, and others; Charles H. King, Detroit, Mich., on the brief for Geo. J. Huber), for appellants.

George E. Brand and George E. Brand, Jr., Detroit Mich., for appellees.

Hugh Francis, Detroit, Mich., for Monroe Paper Products Co.

Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

MILLER, Circuit Judge.

This is a stockholders' suit brought by John P. Kinsey, individually and as a director and stockholder of Monroe Paper Products Company, hereinafter referred to as the Monroe Company, Lawrence G. Kunkel and the Waterbury Corrugated Container Company, individually and as stockholders of the Monroe Company. It is directed against Burton S. Knapp, Charles E. Rancy, George A. Blum, Don B. Leathers and Arthur W. Sempliner, individually and as directors and stockholders of the Monroe Company, and as Trustees under a Voting Trust Agreement pertaining to the stock therein; also George J. Huber, individually and as Chairman of a Stockholders' Committee, and the Monroe Company itself. It charges breach of fiduciary duties on the part of the directors, and seeks among other items of relief their removal as directors of the Company, that the Voting Trust Agreement be declared illegal, and an accounting for the loss and damage sustained by the Company by reason of said violations of fiduciary duties. From a judgment favorable to the plaintiffs, the defendants Knapp, Raney, Blum, Leathers, Sempliner and Huber have appealed.

The complaint as amended was based upon allegations which can be briefly summarized as follows: The Monroe Company was incorporated as a Michigan corporation on or about March 20, 1920 and has been engaged in the business of manufacturing paper and paper container products. Its authorized outstanding capital stock was 190,000 shares of $1.00 par value common stock. For some ten years prior to his death on March 10, 1953, Alex J. Groesbeck was the President, a director, and the largest single stockholder of the Company, and to a large extent controlled its affairs. During that period it was the policy of the Company for Groesbeck to purchase company stock on the open market at market prices on behalf of the Company and transfer the same to the Company's treasury for periodic retirement. The Company was conservatively operated, made conservative dividend payments to stockholders, and maintained substantial cash reserves.

Following Groesbeck's death, a cleavage resulted in the Board of Directors between those supporting the Groesbeck interests and those supporting the defendant Knapp. Knapp, who was a director, but had little knowledge of the Company's business, was elected President, and the defendant Raney, who was also a director, became the operating head of the Company. A fight for the control of the Company followed. On or about October 1, 1953, the Waterbury Corrugated Container Company purchased from the Groesbeck estate faction and others approximately 75,000 shares of the common stock at a price of $10.00 per share. Plaintiffs Kinsey and Kunkel were President and Vice President respectively of Waterbury Company.

In the meantime, the Knapp faction discontinued making purchases of the Company stock for the benefit of the Company, and attempted to acquire stock

for the benefit of themselves and those friendly to them. Funds were secretly deposited in escrow by the Knapp faction with the Monroe State Savings Bank, which had previously handled stock purchases of the Company, through which 15,538 shares of the Company stock were purchased during September, October and November 1953. On October 11, 1953, the defendant, against the vote of the non-defendant directors, without disclosure of the escrow stock purchases and despite a 50% increase in the regular dividend paid September 15, 1953, passed a large unprecedented extra dividend equal to the total 1952 dividends, but withheld payment thereof until January 15, 1954, in order, as charged by the complaint, to allow themselves time to deliver the escrow stock to themselves and those friendly to them.

A stockholders' committee was formed by the defendants, which drafted a Voting Trust Agreement which gave to the defendant directors the voting control of the majority of the Company stock for five years. Company funds and Company facilities were used to solicit stockholders to submit their stock to the Voting Trust Agreement. In addition, the amended complaint charged mismanagement of the Company's affairs and unauthorized expenditures of Company funds in substantial amounts.

The complaint was filed by Kinsey, Kunkel and the Waterbury Company on February 2, 1954. As later amended it charged that the Voting Trust Certificates were not registered under the Securities Act of 1933 and had not been qualified under the Michigan Blue Sky Law; that the Voting Trust Agreement was a restraint of interstate trade and commerce prohibited by the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–8, 15 note, and the Clayton Act, 15 U.S.C.A. § 12 et seq., and was an unlawful restraint on alienation of property contrary to the laws and public policy of the State of Michigan. It asked that the defendant directors be required to disclose information about the foregoing transactions, that the escrow agreement be declared unlawful and in violation of the fiduciary duties of the defendants, that the Voting Trust Agreement be declared unlawful and all deposits thereunder be cancelled, that the defendants be removed as directors and officers of the Company and be required to account to the Company for the damage resulting from violations of their fiduciary duties, and that all stock of the Monroe Company purchased by the individual defendants since July 1, 1953 be cancelled and returned to the Company in accordance with a suggested formula providing for proper compensation. The material allegations were denied by the defendants, and in addition the Company and the individual defendants, except Huber, filed counterclaims, to which replies were filed, making the issues.

Shortly after the filing of the complaint, extensive discovery proceedings were conducted until October 12, 1954 when the trial was started before the Court without a jury. The trial continued until June 2, 1955. On August 4, 1955, the District Judge handed down extensive findings of fact and conclusions of law and entered a partial final judgment under Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C. The judgment provided that the Monroe Company recover from the defendants jointly and severally the sum of $306,982.62 with the Court reserving jurisdiction to enter additional judgments for items of damage not yet passed upon; that the defendant directors be enjoined from recognizing or carrying out the Voting Trust Agreement; that the Trustees under the Voting Trust Agreement be enjoined from voting any of the shares deposited thereunder; and that they terminate and cancel the Voting Trust Agreement and deliver all certificates for shares of stock deposited under the Agreement to the depositors thereof or their transferees. Notice of appeal was filed on August 5, 1955. The District Judge having stated in colloquy with counsel on June 2nd that he would not grant a stay, appellants made application to this Court which entered a stay order

on August 12, 1955, conditional upon the execution of a supersedeas bond in the amount of $250,000. The bond was executed and filed.

This appeal has been thoroughly briefed and argued on its merits. It involves a voluminous record. In addition to the issues presented in a consideration of the merits, appellants at the outset contend that the District Court's findings have no value, and that the judgment should be reversed, because of bias and prejudice on the part of the trial judge and a pre-judgment by him of important issues before trial. Our attention has been directed to many portions of the record as supporting the contention, to some of which we will refer.

One phase of this case, involving an analogous question, has recently been reviewed by us in Appeal of the United States Securities and Exchange Commission and William H. Timbers, its General Counsel, from Order Adjudicating William H. Timbers in Contempt, reported at 6 Cir., 226 F.2d 501, hereinafter referred to as the Timbers case. The facts involved in that phase of the case are set out at length in that opinion, to which reference is now made, and will not be repeated here. Those facts furnish an important background to the question now presented.

As pointed out in the opinion in that case, much of the controversy between the District Judge and the appellants apparently arose out of the erroneous view taken by the District Judge that a part of his function was to conduct a searching inquisition into what he considered to be neglectful inaction of the Securities and Exchange Commission in relation to the Monroe Company's affairs, at page 519. The extent to which this view influenced his actions in the case is shown by the following:

Shortly after the start of the trial the District Judge wrote the District Attorney calling his attention to the charge that the defendants had sold voting trust certificates "in violation of the Securities Act" and making available for examination the file, depositions and a transcript of parts of the evidence. Counsel for the plaintiffs had brought this matter to the attention of the Securities and Exchange Commission, and the Blue Sky Commission of Michigan before institution of the suit, who investigated the matter but took no action. On October 27th the District Judge called District Attorney Kaess, SEC Attorney Rakow and all counsel in the case into his chambers, where the following occurred:

"*The Court:* Just as a coincidence, during this period of time I am in charge of the criminal docket, and, in accordance with our local rules, I also have supervision of the Grand Jury. * * *

"Assuming that I had concluded that a crime had been committed in this community and I had called Mr. Kaess's attention to this matter and he did nothing about it, would that mean that another offense had been committed in the community by Mr. Kaess in concealing a felony? * *

"And, of course, the same question would apply to Mr. Rakow, who, I think, knows probably more about this case than Mr. Kaess does. * * * It has been a long time since I have charged a Grand Jury, but I have a recollection that I instruct them to investigate the matters that are brought to their attention by the District Attorney and by their fellow jurors and by other parties. * * * During the months of October and November, it is right in my charge. If I have reason to suspect that an offense has been committed in the community, have I any excuse for not calling the Grand Jury's attention to it? * * * Assuming that I have informed Mr. Kaess about it and he does nothing, do I have any duty to inform the Grand Jury about Mr. Kaess's inactivity, whatever it may be?"

Counsel for the plaintiffs stated that he did not approve of the suggested pro-

cedure for the reason that the Court might conceivably be accused of trying to complicate the situation by the threat of criminal proceedings. However, the District Judge continued to inject into the picture the possibility of criminal proceedings. During the cross-examination of accountant Moss he suggested to counsel for the plaintiffs that the questions be short and not complicated or involved so that if the witness was not telling the truth the answers might form the foundation of an indictment for perjury. As shown in the Timbers case, supra, at page 507, the District Judge threatened Rakow and Holden, SEC witnesses, with imprisonment for contempt. He told Rakow to report to the Commission that a grand jury could be called at any moment. He suggested the possibility of indicting Paul Rowan, one of the members of the Commission, for attempting to instruct the SEC counsel how he should testify in Court. He called the District Attorney into the courtroom and inquired about his attitude toward the defendants. General Counsel Timbers was actually placed in the custody of the Marshal for contempt of Court, which order this Court reversed. He was denied a stay of execution pending appeal and applied to and obtained from the Chief Judge of this Court, who happened to be in the City at the time, such a stay while still in the custody of the Marshal. Later, the District Judge became displeased with the failure of Timbers to be present at a session of the Court. Although defense counsel pointed out the probability of a misunderstanding and that a contempt order was unnecessary to get the General Counsel of the Securities and Exchange Commission back into court, the District Judge entered an order appointing two members of the Detroit Bar to prosecute possible contempt action against him. He stated that the order would probably be enlarged to cover all the attorneys in the case.

Appellants call attention to the following incidents as indicating hostility and bias and prejudgment of the issues. Before the first witness was called the District Judge remarked that there might be another Federal statute involved, and "I am just making the observation now so you can give it some thought. I might say that this is fairly typical of the practice that is used by promoters in schemes to defraud and in violation of the Mail Fraud Statute."

In colloquy with counsel near the end of the case, the Judge said: "I wasn't in it very long, however, before I concluded that if only a portion of the charges of the plaintiff was sustained here, this was about the worst mail fraud case that I have seen, and I have had a number of them; and it was about that time that I referred the matter to the District Attorney and had the discussions with a representative of the SEC." The case is not a mail-fraud case. The Judge followed with a statement critical of the defendant directors for not being willing to disclose all of the facts in the case, and upon defense counsel stating that he did not quite understand what the Judge was saying, the Judge replied: "I do not think you have since the beginning of this case, and I am not surprised that you do not know now." When counsel said he would rest on the record, the Judge answered: "Yes, your attitude towards the duties and obligations of trustees is apparently quite different from what I think the attitude on the basis of common morality should require, and certainly the legal obligations."

On December 7, 1954, shortly after the defense evidence started, the Judge suggested the need of having an independent auditor working directly with plaintiff counsel, although the Court would not be able to allow an attorney's fee for auditing work. He stated that normally an auditor could do a little better job of auditing than most lawyers could. In the discussion that followed, the Judge said: "Don't you think that you have assurance now of collecting enough money so that you could justify the expenditure for that kind of audit?" When plaintiffs' counsel stated that his clients were willing to advance and take

their chances on reimbursement, the Judge replied: "Well, you won't have to take any chances on that. You will either recover enough money to pay this auditor, or I guess maybe I will have to pay him. I don't want him to be under any obligation to any particular stockholder." The Judge recommended a certified public accountant named Johnson, who had satisfactorily performed similar services for the Court in other cases. Johnson was appointed over defendants' objections. Defense counsel pointed out that while the parties were in the middle of a trial involving the recovery of expenditures made by the Company, the Court was appointing an auditor to be paid out of the funds recovered, thus putting the Court in the position of having to find the funds out of which to pay the auditor. Counsel contend on this review that if such funds were not made available through the result of the case, the Court might be under an obligation to personally pay the expense. The Judge stated that on the basis of the facts that had already been conceded by the defendants, it was perfectly obvious that some of the funds of the Company had been misapplied. Counsel replied that he knew of nothing in the papers already introduced by the plaintiffs that conceded that there had been a misapplication of corporate funds. The following then occurred. "The Court: Your statement now just makes it obvious to me that you haven't studied the law relating to this type of an action. There isn't much I can do for you until you do study it. Mr. Sempliner: Well, your, Honor, in view of that, I would like to withdraw our consent to all proposed findings. The Court: Well, I will not permit it."

Johnson was later called as a witness for the plaintiffs on December 29, 1954, at which time it developed that he had prepared and delivered to the Court shortly prior thereto a memorandum or document relating to the disputed issues, but which had not been shown to counsel for either plaintiffs or defendants. Defense counsel's request that it be made available to them at once so as to enable them to know what the Court was considering and to place them in a position to make any explanations or additions thereto that might appear necessary was not complied with, although the Judge stated that whatever information the witness had given him would be made available to counsel "not very much later." Plaintiffs' counsel stated that it would be introduced as an exhibit by the witness. The witness was temporarily excused and shortly thereafter recalled, at which time he filed a report identified as Exhibit No. 234, which we assume was the document in question. Johnson was recalled as a witness and further examined on March 3, 1955, at the close of which defendants began their cross-examination. The Court stated that the cross-examination would have to be completed that afternoon in order to permit Johnson to leave early the next morning for Mexico in connection with Olympic Game activities in that country. Cross-examination continued until 5:00 p. m., at which time defense counsel stated that it was long after the usual court hours and in the absence of certain books of the Company dealing with previous years he was unable to complete the cross-examination that afternoon and would want to continue it the next morning. The following then occurred:

"The Court: You will go right ahead to-night. Mr. Sempliner: Well, your Honor, I am through for to-night. The Court. You are through for to-night? All right. Then the witness may be excused, * * * Mr. Sempliner: I would like to take exception to the Court's ruling and object." Appellants point out that although Johnson had been available as a witness for several months, their cross-examination of him was arbitrarily limited to a portion of a day and the witness excused before it was completed.

Other incidents which appellants call to our attention include the following:

The Judge stated in colloquy with counsel, before the trial was completed:

"It has developed since this case started, or, since we started taking testimony, that Cook and Boudinet were active participants in the conspiracy. Unfortunately, they were not made defendants at the time the suit was started, and that is understandable." Cook and Boudinet were officers of the Monroe State Savings Bank, Boudinet being its Trust Officer. Boudinet later testified about stock deposited under the Voting Trust Agreement, following which the Judge stated: "All right, Mr. Boudinet, I want to ask you a few questions. * * * Did you understand that as late as yesterday the chief law enforcement officer for the Federal Government stated on the witness stand that he was investigating your conduct in connection with this matter?" The correctness of the statement by the Judge was challenged by defense counsel, but it was not withdrawn.

Defense witness Kirby was called out of the audience and interrogated by the Judge as to why he was present at the trial.

A witness Weipert, who was a lawyer, testified for the defendants. The Judge told plaintiffs' counsel that they should not hesitate, because he was a lawyer, to attack his honesty and integrity, and that the Court intended to make a finding as to Weipert's credibility in view of "the criminal aspects" of the case. At one point during Weipert's testimony the Judge interrupted by saying: "Let's put it frankly. Who are you trying to fool?" Weipert's request for leave to explain an answer was refused.

The Judge participated actively in the examination and cross-examination of the defendant Sempliner, who also served as attorney for the defendant directors. At one point in the cross-examination the following occurred: "The Court: What did you mean by the use of that term 'reasonable return'? Answer: A dividend policy in line with what it had been about the time they had bought it. Mr. Brand: Have you finished, your Honor? Question (By Mr. Brand): I read you what you said in your. * * *

The Court (Interposing): I finished to the extent the witness didn't answer my question, but then, I am having no different experience than you are with this witness, so I decided to quit. Answer: May I try and answer your question again, your Honor, and have it read back? The Court: I prefer to have you answer it when I ask it, rather than spend some time deliberating on what you think your answer should be, so we will just let the record stand as it is." This was followed shortly thereafter by the Judge's statement: " * * * I will have to make a finding with reference to the credibility of the witnesses, an unpleasant task, but I am afraid I will have to do it."

The appellants cite the following occurrences as showing that the District Judge took an active part in assisting the plaintiffs in presenting their case and in proving their contentions.

He suggested to their counsel that they move to dismiss defendant's counterclaim. He suggested that another stockholder intervene, who had held stock for a longer period of time, which "would entirely eliminate that problem that we have of whether the expenditures were made prior to the time that Mr. Kinsey purchased his stock, wouldn't it." He raised the question if it was too late to get the bank in as a defendant, saying that it had much more to do with the promotion of the program than Huber did and that "It might be easier to collect the judgment from the bank." In colloquy with plaintiffs' counsel, the Judge said: "I might say, Mr. Brand, that I can little by little pick up these items that I think you are under obligation, representing the stockholders, to look for * * *; but you have well known Mr. Sempliner's attitude here for a long time; * * * that if you are going to get a judgment against the directors, you will have to dig for the stuff, they are not going to help you." This was followed a little later by: "So that I have an uncomfortable feeling that you haven't made an adequate study to give an appellate court an adequate picture of how

loosely the company's money was handled." In discussing the question of damages he indicated to counsel that if a compromise offer of $160,000.00 was recommended to him, he would not approve it, and suggested the possibility of a judgment for $500,000.00.

The Judge made this suggestion to plaintiffs' counsel: " * * * Why not subpoena Mr. Rakow who had charge of it here and find out what happened, then you have an additional evidence of the violations of their fiduciary duties in that they are spending their time when they ought to be working at the plant, trying to sustain the position when they know they are legally wrong. * * * Why not do it? It seems to me you are too cautious about a lot of things here."

The Judge suggested that they take the depositions of the SEC Commissioners in Washington; that they call as witnesses the SEC people in the courtroom; without having the question presented, he expressed a tentative opinion that the defense lawyers could not claim privilege if questioned about the use of company funds in the payment of legal fees; requested that defendant Sempliner be questioned about three specified matters; asked that a number of people be called as witnesses; and near the end of the trial made the remark—"Let me finish this. I am doing clean-up work for you."

Appellants' position on this appeal is reflected by counsel's statement at the close of the case when a discussion took place relative to a submission of the case and the findings and judgment. He stated to the Court: "May it please the Court, frankly it seems to me that it would be just as well if we did not work with you from here on. * * * Now, your Honor has said that you will receive briefs and hear arguments. I do not believe you need wait to do that. It is the feeling of my clients that so much was decided so long ago that we do not wish to burden the Court with any further brief in addition to what we have already filed; and that the court need not call on us for any further argument in the matter. * * * so it would seem to me that the sooner a decision of some kind can be made, in form to be appealable, that the better off all parties will be."

One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of actual bias or prejudice in the trial of the case. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942; Talbert v. Muskegon Construction Co., 305 Mich. 345, 348, 9 N.W.2d 572. If this basic principle is violated, the judgment must be reversed. In re Murchison, supra; Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed 481; Moskun v. United States, 6 Cir., 143 F.2d 129, 130; N. L. R. B. v. Phelps, 5 Cir., 136 F.2d 562.

Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts or statements on his part. Or it may appear during the trial by reason of the actions of the judge in the conduct of the trial. If it is known to exist before the trial it furnishes the basis for disqualification of the judge to conduct the trial. Section 144, Title 28, U. S. Code. This section provides: "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." This statutory provision is not directly applicable to proceedings wherein the claimed bias or prejudice appears during the course of the trial. However, there would seem to be close analogy between bias and prejudice which would disqualify a judge from sitting in a judicial proceeding and the bias or prejudice appearing during the course of the proceedings which would render the judgment therein invalid. The following

rulings are accordingly helpful in determining what constitute bias or prejudice on the part of a judge so as to require a reversal of a judgment rendered by him.

The bias or prejudice which will disqualify a judge must be "personal" bias or prejudice as distinguished from a judicial one. Craven v. United States, 1 Cir., 22 F.2d 605, 607–608, certiorari denied 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739. It is not sufficient if the alleged bias or prejudice arises out of the judge's background and associations rather than his appraisal of the complaining party personally. Price v. Johnston, 9 Cir., 125 F.2d 806, 811; Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, 278. Nor is it sufficient that the alleged bias or prejudice arises from the judge's view of the law, which may have been expressed by him in some prior case. Loew's, Inc., v. Cole, 9 Cir., 185 F.2d 641, 646; Ferrari v. United States, 9 Cir., 169 F.2d 353. A judge is not disqualified merely because he believes in upholding the law, even though he says so with vehemence. Baskin v. Brown, 4 Cir., 174 F.2d 391; Foster v. Medina, 2 Cir., 170 F.2d 632. Imposition of sentences which are very severe, but which are within legal limits provided by the statute, does not, standing alone, establish the necessary bias and prejudice. Calvaresi v. United States, 10 Cir., 216 F.2d 891, 900. Adverse rulings during the course of the proceedings are not by themselves sufficient to establish bias and prejudice. Ex parte American Steel Barrel Co., 230 U.S. 35, 44, 33 S.Ct. 1007, 57 L.Ed. 1379; Refior v. Lansing Drop Forge Co., 6 Cir., 124 F.2d 440, 444; Littleton v. DeLashmutt, 4 Cir., 188 F.2d 973, 975, certiorari denied 342 U.S. 897, 72 S.Ct. 229, 96 L.Ed. 672; Beecher v. Federal Land Bank, 9 Cir., 153 F.2d 987, 988, certiorari denied 328 U.S. 871, 66 S.Ct. 1364, 90 L.Ed. 1641, rehearing denied 329 U.S. 819, 67 S.Ct. 28, 91 L.Ed. 697. See also In re J. P. Linahan, Inc., 2 Cir., 138 F.2d 650.

The trial judge in the federal court is more than a mere arbitrator to rule upon objections and to instruct the jury. It is his function to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. It is his duty to see that the issues are not obscured and that the testimony is not misunderstood. He has the right to interrogate witnesses for this purpose. Fidelity & Deposit Co. of Maryland v. Bates, 8 Cir., 76 F.2d 160, 170; Montrose Contracting Co. v. Westchester County, 2 Cir., 94 F.2d 580, 583, certiorari denied 304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1529; Lewis v. United States, 6 Cir., 11 F.2d 745, 747.

However, the right of the trial judge to participate in the proceedings and to interrogate witnesses is not an unlimited one. Such participation should be exercised in conformity with the standards governing the judicial office. Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321. The judge should exercise self-restraint and preserve an atmosphere of impartiality. Pariser v. City of New York, 2 Cir., 146 F.2d 431, 433. When the remarks of the judge during the course of a trial, or his manner of handling the trial, clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contentions of such party, the judge indicates, whether consciously or not, a personal bias and prejudice which renders invalid any resulting judgment in favor of the party so favored. Crowe v. Di Manno, 1 Cir., 225 F.2d 652; In re Parkside Housing Project, 290 Mich. 582, 598–599, 287 N.W. 571; Clarke v. Commonwealth, 259 Ky. 572, 82 S.W.2d 823. As said by the Supreme Court in Berger v. United States, supra, 255 U.S. 22, 35, 41 S.Ct. 230, 234, " * * * the tribunals of the county shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial,

free, to use the words of the section, from any 'bias or prejudice' that might disturb the normal course of impartial judgment." In In re Murchison, supra, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, the Supreme Court said "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." In Whitaker v. McLean, 73 App.D.C. 259, 118 F.2d 596, the Court said—"Hostility is a form of bias. * * * The policy * * * is that the courts of the United States 'shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial'; i. e., shall appear to be impartial. * * * Often some degree of bias develops inevitably during a trial. Judges can not be forbidden to feel sympathy or aversion for one party or the other. Mild expressions of feeling are as hard to avoid as the feeling itself. But a right to be tried by a judge who is reasonably free from bias is a part of the fundamental right to a fair trial." In Connelly v. United States District Court, 9 Cir., 191 F.2d 692, 697, the Court said—"It is not enough that the judge, despite his predetermination of essential facts, may put them aside and conduct a fair trial but that there also shall be such an atmosphere about the proceeding that the public will have the 'assurance' of fairness and impartiality." In Brown v. Walter, 2 Cir., 62 F.2d 798, 800, the rule was briefly summarized: "Justice does not depend upon legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge." Absence of the necessary "judicial calm" caused this Court in Moskun v. United States, supra, 143 F.2d 129, to reverse the judgment and remand the case for retrial by another judge.

In our opinion, the conduct of the District Judge did not conform to the standard required by the foregoing authorities. Whether unconsciously or otherwise, he failed from the start of the trial to view this case with the impartiality between litigants that the defendants were entitled to receive. His active participation in the case and in the questioning of witnesses exceeded what was reasonably necessary to obtain a clear understanding of what their testimony was and fully justifies appellants' complaint that at times "he, figuratively speaking, stepped down from the bench to assume the role of advocate for the plaintiff." Although appellees' counsel did not ask or need such assistance, and apparently at times realized the possible prejudice to their cause, the prejudicial effect to appellants' rights requires a reversal of the judgment. Appeal of United States Securities and Exchange Commission, supra, 6 Cir., 226 F.2d 501, 519, 520; Berger v. United States, supra, 255 U.S. 22, 41 S.Ct. 230; Crowe v. Di Manno, supra, 1 Cir., 225 F.2d 652, 659; Whitaker v. McLean, supra, 73 App. D.C. 259, 118 F.2d 596; N. L. R. B. v. Phelps, supra, 5 Cir., 136 F.2d 562.

The judgment is reversed and the case remanded to the District Court for a retrial before another judge.