815 F.2d 79
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
OLGA'S KITCHEN, a California corporation, Plaintiff-Appellee,
v.
Dr. Michael PAPO, Individually and d/b/a PSS Associates,
Defendant-Appellant,
 Nos. 85-1581, 86-1088.
 United States Court of Appeals, Sixth Circuit.
 Feb. 16, 1987.
 
 Before KEITH and WELLFORD, Circuit Judges, and, TODD, District Judge.*
 WELLFORD, Circuit Judge.
 
 
 1
 Plaintiff-appellee, Olga's Kitchen of Hayward, California, Inc., (Olga California), is a wholly owned subsidiary of Olga's Kitchen, Inc., a Michigan corporation (Olga's). Olga's is a national restaurant chain, specializing in Greek food. After Olga's prior investment arrangement with Michael Papo, defendant-appellant, in a San Jose, California operation in 1977, Papo and Olga California entered a five year equipment and leasehold improvements leasing agreement for Olga's Hayward mall location.[1] The agreement was dated June 1, 1978 and the first lease payment was made in August 1978, but the agreement was not signed until 1979. Robert Solomon, president of Olga's, explained this time lapse by testifying that Olga's purchased the equipment and leasehold improvements for the store[2] and sent the bills to Papo, who in turn reimbursed Olga's. Once the exact purchase price for the equipment and leasehold improvements could be calculated, the parties could determine the correct amount of rent to charge plaintiff. The monthly rental amount eventually was set at $9,144.00.
 
 
 2
 Olga's shopping mall lease, personally guaranteed by Solomon, was not pledged as security for the lease with Papo. Defendant Papo has belatedly argued that an oral agreement existed between Solomon and Papo, in which Solomon agreed that the mall lease would be security for the equipment lease.
 
 
 3
 When this leasing arrangement was executed in 1978, Papo was an investor and was neither in the leasing business nor in the restaurant equipment business. The $9,144.00 monthly rental was designed to yield a 16 percent return to defendant on his $376,636.00 investment, with the investment to be amortized over the five year period.
 
 
 4
 The lease provided that on termination of the lease, Olga's was to return the equipment[3] to Papo in good condition and at its own expense to locations designated in the lease. Alternatively, Olga's was given an option "to purchase the Equipment at a price equal to its then fair market value, payable in cash prior to such expiration date." Olga's right to exercise this option was contingent on its giving notice to Papo ninety days before expiration of the lease of its intent to exercise the option and its not being in default "at any time." The option to purchase could therefore be exercised within ninety days of the expiration of the lease on May 31, 1983.
 
 
 5
 The lease was nonassignable, and interest was payable on late rental payments at a rate of 1.5% until paid and "payment of such interest shall not excuse or cure any default." The lease also provided that "[a]ny holding over after the expiration of the term with the consent of Lessor, shall be construed to be a tenancy from month to month at the rents herein specified [$9,144.00 per month] for the last month of the stated term and on the terms and conditions herein specified. Finally, Papo relies on paragraph 17 of the lease, which provides:
 
 
 6
 Waiver. No default in the payment of rent or any other amount set forth herein, nor the failure of Lessor to enforce the provisions of this Lease upon any default by Lessee shall be construed as creating a custom of deferring payment or as modifying in any way the terms of this Lease or as a waiver of Lessor's right to terminate or cancel, or otherwise to enforce the provisions hereof. No express waiver by Lessor or any provision, condition, or term shall affect any other than the provision, condition or term specified, and that only as specifically stated, and shall not be deemed to imply to constitue [sic] a subsequently [sic] waiver of such provisions, condition, or term. No breach of a covenant or condition of this Lease shall be deemed to have been waived by Lessor, unless in writing by Lessor. It is expressly agreed that time shall be of the essence of this Agreement.
 
 
 7
 Olga California made its first payment to Papo in August 1978, including rent for the first and last month of the lease term in accordance with the lease's terms as well as for the current month. Papo applied the payments to June, July, and the last month of the lease term.[4] From the outset, plaintiff made late rental payments. Occasionally, some of the payments were also deficient in amount, but plaintiff eventually covered the deficit.[5] The tardy payments were allegedly due to poor cash flow resulting from extensive expansion plans. Plaintiff did apprise Papo of its financial difficulties and continuing intent to make the payments under the arrangement. Between March of 1980 and May of 1982, Papo's controller sent letters to plaintiff seeking late charges for tardy rent payments as well as other miscellaneous charges. Plaintiff did not pay all the claimed delinquent interest charges but did make such a payment on three occasions, even overpaying once. Some charges were contested.
 
 
 8
 In any event, all rental payments due under the lease were ultimately paid, the final payment coming in June 1983, a few weeks after the lease had expired. Neither Papo nor anyone in his organization at any time during the lease term indicated that the Hayward lease was in default. The default claim was not raised until Papo responded to plaintiff's complaint.
 
 
 9
 In February of 1983, more than ninety days before the lease was to expire, plaintiff sent a letter to Papo indicating that it was exercising the lease option to purchase at fair market value the equipment and leasehold improvements. Papo responded by letter two months later:
 
 
 10
 The clause to which you refer in the Equipment Lease grants the Lessee the option to purchase the Leased Equipment at a price equal to its fair market value upon the date the lease expires. There were no amounts mentioned in your letters of February 11th; and we ask that you advise as to whether the Lessees are prepared and willing to pay the fair market value of the leased equipment. I assume that your reply will set forth such values.
 
 
 11
 Absent compliance with the provisions of the Equipment Lease, Dr. Papo requests that appropriate arrangements be made to surrender the Leased Equipment to him upon the date that these Leases expire.
 
 
 12
 The next month, after an appraisal had been completed, Olga's responded, offering to pay $34,147.00 as the fair market value of the equipment and improvements at the Hayward restaurant, and stated: "We are ready and able to close these purchases [including the equipment from the San Jose operation not involved in this litigation]. Please advise as to how you wish to proceed." Plaintiff's president testified as to capability of tendering in cash the proffered amount.
 
 
 13
 Papo's response came in June 1983, after the May 31, 1983 termination of the lease. The letter stated: "The sums proffered in your letter of May 23, 1983, are not commensurate with the current market value of the leased equipment of each Unit, and said offers are therefore rejected." Papo clearly did not base rejection of Olga's attempt to exercise the option on any default in making timely lease payments and in paying interest on those delinquent rent payments. Papo simply deemed the purported fair market price as too low. Papo rejected the purported exercise of the option to purchase equipment at San Jose, stating: "the rights of the Lessee to purchase the leased equipment were extinguished by reason of its defaults." Separate litigation involving Olga and Papo took place in Michigan state court concerning the San Jose operation. See 149 Mich.App. 285, 386 N.W.2d 177 (1986).
 
 
 14
 With ten years yet to run on its lease with the mall, Olga's remained at its Hayward location, using the improvements and equipment in dispute. Although all rent payments had been made, plaintiff had not paid all of the claimed delinquent interest when it attempted to exercise the option when the lease expired, nor did it pay late interest by the time trial began.
 
 
 15
 In September 1983, plaintiff filed suit seeking a declaratory judgment that it had timely and effectively exercised its option to purchase, that $34,147.00 be declared the fair market value for the leasehold equipment, and that plaintiff be granted specific performance of the option agreement. When defendant failed to respond, plaintiff obtained entry of default in January 1984, which was later set aside.
 
 
 16
 Papo finally filed a denial and a counterclaim, claiming that plaintiff had breached the leasing agreement by refusing to return the equipment at the end of the lease. Papo sought $350,000 as the property's alleged value, rent for the holdover tenancy, attorneys' fees, and costs. Papo also claimed conversion due to plaintiff's retention of the equipment and improvements at Hayward. For conversion Papo sought, in addition to the previous $350,000 claim, punitive damages of $1,000,000.00.
 
 
 17
 Despite plaintiff's efforts at discovery, Papo and his organization were uncooperative. Plaintiff was twice forced to seek judicial assistance to compel discovery. The alleged discovery abuses prompted, in part, Judge Cohn's imposition of Rule 11 sanctions on defendant and his attorneys, which will be discussed subsequently.
 
 
 18
 Before the scheduled nonjury trial, plaintiff submitted a timely trial brief; Papo, on the other hand, slipped his brief under the judge's door on the morning of trial. In that brief, Papo challenged for the first time Olga's right to exercise the option. Papo then claimed the option was nonassignable and that agreement was made with a wholly owned subsidiary of Olga's. Also for the first time, Papo in this brief challenged the legal sufficiency of Olga's tender. After a four day bench trial in which Papo did not testify, Judge Cohn found for plaintiff, reasoning that plaintiff effectively exercised the option to purchase. He held that the leasing arrangement was actually a financing agreement, as he felt the parties intended it to be. The district judge also determined that the leasehold improvements had no value at the conclusion of the leasehold term, because the improvements had become part of the real estate and were not removable. The trial court decided that the removable equipment had a fair market value of $13,835.00, in accordance with appraisal evidence. Judge Cohn found, however, that Papo was entitled to $11,876.44 in interest due on the delinquent payments. In summary, the district court ordered plaintiff to pay $25,711.44 (delinquent interest plus the value of removable equipment) in twenty days to have title to the equipment transferred to Olga's, rejecting specifically Papo's claim that a material breach had precluded exercise of the option. Judge Cohn also rejected Papo's attempts during trial to use a "value-in-place" measure of fair market value.
 
 
 19
 Plaintiff timely paid the judgment to Papo, and the court transferred title in the equipment and improvements to Olga's. Papo now appeals, claiming numerous errors. Papo's arguments on appeal fall into four categories: (1) the legal validity of Olga's purported exercise of the option to purchase; (2) adequacy of the relief awarded to Papo; (3) Judge Cohn's alleged partiality against him, and (4) propriety of sanctions imposed. We affirm in part and reverse in part.
 
 I. EXERCISE OF THE OPTION
 A. "Standing" to Exercise The Option
 
 20
 Not until the time for the beginning of trial did Papo contend Olga's did not have "standing" to exercise the option Papo claimed was nonassignable. The district court ignored this argument as coming too late and effectively waived. Testimony indicated that Olga's and Olga California acted together in the leasehold arrangements, and that Papo never objected to dealing with either one during the course of their dealing at Hayward. Correspondence between Papo and Olga's indicated that Papo effectively recognized Olga's as the lessee. Furthermore, no evidence suggests that the lease was ever assigned. Olga's was, under the circumstances, a proper party to exercise the option and had standing to pursue it on behalf of its wholly owned subsidiary.
 
 B. Effect of Acceptance of Late Payments
 
 21
 Papo never claimed plaintiff to be in default during the lease period for late rent payments, but at trial argued that the "no waiver" clause, paragraph 17 of the lease agreement, precluded exercising the option to acquire the leasehold equipment and improvements. Papo claims that his conduct did not waive invocation of the "no waiver" clause. The district court, however, ruled that this claim of default "was an afterthought by defendant."
 
 
 22
 A lessor may waive a "nonwaiver" clause in a lease agreement by a persistent course of conduct in accepting late payments. Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 873-74 (10th Cir.1981); Dillingham Commercial Co. v. Spears, 641 P.2d 1, 7-8 (Alaska 1982). The question whether Papo did in fact waive his right to rely on Olga's default in making late payments is one of fact. See, e.g., Westinghouse Credit Corp., 645 F.2d at 873-74; Jefpaul Garage Corp. v. Presbyterian Hospital, 61 N.Y.2d 442, 462 N.E.2d 1176, 474 N.Y.S.2d 458, 461 (1984).
 
 
 23
 We do not find error under these circumstances in the district court's holding. A lessor may by its conduct waive not only the timeliness of lessee's performance, but also the "no waiver" clause itself. See, e.g., Westinghouse, 645 F.2d at 874, and Jefpaul, 474 N.Y.S.2d at 458-61. As in Dillingham, Papo acquiesced in late payments by Olga's throughout almost the entire five year lease arrangement. The correspondence between the parties about the exercise of the option, moreover, manifests Papo's waiver of the "nonwaiver" clause. Instead, Papo sought fair market value for the equipment. When Papo finally rejected Olga's proposal by the June, 1983, letter, it did so solely on the basis that the amount was insufficient, rejecting at the same time on the basis of default Olga's exercise of a similar option to purchase equipment in a San Jose restaurant.
 
 C. Interest on Delinquent Payments
 
 24
 Plaintiff failed to pay interest due to Papo arising from its delinquent payment of rent. Again, Papo never asserted that this failure to make delinquent interest payments amounted to a material default that would prevent Olga's exercise of the option. As in the case of the late rental payments, Papo was held to have waived application of the no waiver clause. Unlike the late payments, which default Papo excused by repeated acceptance, Olga's failure to make the interest payments continued until trial and placed Olga's in breach. The issue becomes whether that breach was material and thereby would prevent Olga's from exercising the option.
 
 
 25
 Materiality of a breach, like the existence of a waiver, presents a fact question to be resolved by the factfinder. Jameson v. Foster, 646 P.2d 955, 957 (Colo.Ct.App.1982). If a breach is not substantial, a lessee is not prevented from exercising an option. Id. at 957-58. In determining whether a default is material, a court should consider whether the landlord has been harmed or prejudiced and whether the tenant has acted in good faith. 1014 Fifth Avenue Realty Corp. v. Manhattan Realty Co., 111 A.D.2d 78, 489 N.Y.S.2d 204, 205 (N.Y.Sup.Ct.1985). Further consideration is given to the tenant's resulting forfeiture if specific performance was denied. Id. ("equity will intervene to prevent a forfeiture occasioned by a trivial or technical breach"). Thus, when the " 'allegations are de minimis in nature,' and the landlord 'has failed to show any prejudice resulting from the tenant's alleged breach of the terms of the lease,' " a material breach may not have occurred and specific performance should be ordered. Id. at 206, quoting Restoration Realty Corp. v. Robero, 58 N.Y.2d 1089, 1091, 462 N.Y.S.2d 811, 449 N.E.2d 705 (1983).
 
 
 26
 Papo showed no real prejudice by reason of late interest payments; when Olga's paid off the interest after judgment was entered, Papo was fully compensated. Bad faith on Olga's part was not demonstrated. Moreover, the trial court took judicial notice that the amount of interest owed was relatively insignificant in comparison to the approximately $540,000.00 already paid as rent. We find no error in the district court's finding no material breach in Olga's failure to pay interest payments amounting to approximately 2% of the total rent (or "finance") payments made. Forfeiture in this case would work substantial inequity, considering the additional finding that the arrangement between the parties was not, in reality, a lease but rather an equipment financing agreement.
 
 D. Effectiveness of Tender
 
 27
 Papo next argues that Olga's made a legally sufficient tender to trigger exercise of an option to purchase. Papo contends that Olga's was required to tender to Papo in cash before the May 31, 1983 deadline Olga's suggested fair market value of $34,147.00 for the equipment before the option could be exercised.
 
 
 28
 The option in this case was to be exercised by Olga's paying fair market value for the equipment rather than a specified amount. Thus the term was left open for reasonable negotiation as to fair market value in the event Olga's chose to exercise the option. Plaintiff indicated a clear and timely intent to exercise the option. In response Papo directed that Olga submit a fair market value for the leased equipment. Prior to expiration of the lease, in accordance with Papo's direction, Olga set what it deemed to be fair market value of the equipment and improvements in the Hayward store at $34,147.00 and indicated that it was "ready and able to close these purchases." After the lease had expired, stating that the sum offered was not "commensurate with the current market value of the leased equipment," Papo rejected the option proposal, but did not set out its version of fair market value before expiration. Thus Papo effectively prevented Olga's from tendering an acceptable amount without making a counteroffer.
 
 
 29
 Tender of cash is not always a condition precedent to an effective exercise of an option. Michigan courts have on several occasions found that a failure to tender cash was not fatal to actions for specific performance or contract damages: "The law of tender is replete with cases which depart from the generalization that tender is the payment in hand of legal currency to explore the fact-laden paths of the litigants' course of dealing." Birznieks v. Cooper, 405 Mich. 319, 328, 275 N.W.2d 221, 224 (1979). "Tender requires the offer of that to which the tenderee is entitled, without qualification or condition, an actual offer to pay coupled with present ability." Duiven v. Brakesman, 356 Mich. 1, 3, 95 N.W.2d 868, 869 (1959). Another court has added:
 
 
 30
 "when the default has not been serious and the vendee is willing and able to continue with his performance of the contract, the vendor suffers no damage by allowing the vendee to do so. In this situation, if there has been substantial part performance or if the vendee has made substantial improvements in reliance on his contract, permitting the vendor to terminate the vendee's rights under the contract and keep the installments that have been paid can result only in the harshest sort of forfeitures. Accordingly, relief will be granted whether or not time has been made of the essence." [Barkis v. Scott 34 Cal.2d 116, 208 P.2d 367, 371 (1949) ].
 
 
 31
 6 Williston on Contracts, Sec. 834 at 113-14. Williston, in his treatise, explored at greater length when formal tender is not mandated in actions at law, by quoting from Cladianos v. Friedhoff, 69 Nev. 41, 240 P.2d 208, 210 (1952):
 
 
 32
 "The word 'tender' as used in such connection does not mean the same kind of offer as when it is used in reference to the payment or offer to pay an ordinary debt due in money, where the money is offered to a creditor who is entitled to receive it, nothing further remains to be done, and the transaction is completed and ended; but it means only a readiness and willingness accompanied with an ability on the part of one of the parties to do the acts which the agreement requires him to perform, provided the other will concurrently do the things which he is required by it to do, and a notice by the former to the latter of such readiness. Such readiness, ability, and notice are sufficient evidence of, and indeed imply, an offer or tender in the sense in which those terms are used in reference to mutual and concurrent agreements. It is not an absolute, unconditional offer to do or transfer anything at all events, but it is, in its nature, conditional only, and dependent on, and to be performed only in case of, the readiness of the other party to perform his part of the agreement.
 
 
 33
 "The law is clear, however, that any affirmative tender of performance is excused when performance has in effect been prevented by the other party to the contract.... It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.
 
 
 34
 "In this respect it is stated that the term 'prevented from performing' does not mean 'that there must be physical prevention, but that any acts, conduct, or declarations of the party, evincing a clear intention to repudiate the contract, and to treat it as no longer binding, is a legal prevention of performance by the other party.
 
 
 35
 " '... a refusal on the part of the defendant to perform obviated the necessity of performance, or tender of performance, on the part of the plaintiff, after such refusal.' "
 
 
 36
 6 Williston, Williston on Contracts, Sec. 832 at 101-03 (W. Jaeger ed. 3d ed. 1962) (footnotes omitted).
 
 
 37
 Although the quoted passage refers to actions for damages at law, Williston stated the rule is essentially the same for actions for specific performance in equity. Id., Sec. 834 at 109-13. Furthermore, under a court's equitable power, serious consideration must be given to determine whether a strict rule of tender would cause a forfeiture.
 
 
 38
 "A party does not forfeit his rights to the interposition of a court of equity to enforce a specific performance of a contract, if he seasonably and in good faith offers to comply, and continues ready to comply, with its stipulations on his part, although he may err in estimating the extent of his obligation." [Willard v. Tayloe, 75 U.S. (8 Wall.) 557, 569 (1868).]
 
 
 39
 Id. at 113-14 (footnotes omitted).
 
 
 40
 Plaintiff's evidence that it was ready and willing in good faith to exercise the option to purchase in accordance with the agreement's terms adequately satisfied the tender requirement, Papo prevented Olga's from timely tendering an acceptable sum. Because of these circumstances, harsh forfeiture would result if actual tender were mandated, and we find no error in the trial court's refusal to reach such a result. Papo indicated that the issue of fair market value was open to negotiation and did not suggest that any particular sum by Olga's would be accepted.[6]
 
 II. FAIR MARKET VALUE
 
 41
 When Olga's submitted what it deemed to be a fair market value for the equipment and leasehold improvements, it quoted a figure of $34,147.00 based upon an appraiser's evaluation; the movable equipment was valued at $13,880.00 and the improvements were valued at $20,312.00. The district court noted the basis for the first appraiser's assessment of fair market value:
 
 
 42
 The equipment was valued by taking the initial cost, adjusting such cost to today's figures, and then deducting straight line depreciation on each item over its estimated useful life with a factor for functional and economic obsolescence. In general, the equipment was considered to have an eight-year useful life, so that approximately 5/8ths of its computed original cost was deducted. As a check the appraiser estimated that restaurant equipment of the kind involved after five years is worth about ten percent of its initial cost.
 
 
 43
 The leasehold improvements were valued by adjusting initial cost to original cost as of May 30, 1983, and then depreciating them over what the appraiser thought was a ten year term of the underlying lease. When it was pointed out that this term was fifteen years, the $20,312.00 was adjusted to $60,323.00.
 
 
 44
 At trial plaintiff's second appraiser testified in response to a question posed by Judge Cohn that the leasehold improvements "really had no fair market value at the end of the five year term, because they could not be removed from the premises and, therefore, there was no one to purchase them."[7]
 
 
 45
 The district court then noted Papo's valuation contentions:
 
 
 46
 Defendant obtained an appraisal for the first time in the fall of 1984, more than a year after plaintiff filed suit. While defendant's appraiser initially was instructed to use fair market value as the criteria for valuation, he was subsequently instructed to use value-in-use or use value. As explained in defendant's interrogatory answer, defendant valued the leasehold improvements and equipment at $350,000.00 based on "the value of the equipment in use as an integral part of an operating enterprise."
 
 
 47
 At trial, defendant's appraiser testified that the equipment had a value of $86,600.00, based upon value-in-use, and the leasehold improvements had a value of $229,963.00, based on depreciated reproduction cost for an aggregate value of $316,536.00. In his post-trial proposed findings, defendant asserts the value of the equipment as $51,092.00, and the leasehold improvements have a value of $158,272.00, for a total value of $209,364.00.
 
 
 48
 Value-in-use, which is the underlying principle of defendant's approach, is defined by his appraiser as "the value of assets in use as an integral part of the operating enterprise with consideration given to the age, condition and utility and the used market value insofar as applicable without consideration as to whether the earnings justify an investment in the assets as they stand."
 
 
 49
 Use value or value-in-use has also been defined as the value of property designed to fit the specific requirements of the owner, but which would have little or no value to another. See Boyce, Real Estate Appraisal Terminology, Ballanger Publishing Company (rev. ed.).
 
 
 50
 The district court rejected the value-in-use theory and testimony and indicated what he believed to be the parties' intent in setting fair market value for the leased equipment:
 
 
 51
 Any amount received by defendant for the leasehold improvements and equipment after the expiration of the five-year term is a windfall. Defendant entered into the lease with the expectation of getting back his $376,636.00 investment over a five year period while he earned 16 percent and while he received the tax benefits of ownership. Defendant did not and could not control the shopping center premises. The leasehold improvements were not removable. In substantial part, they were not identifiable. As for the equipment, once removed, it was no more than secondhand. There is no warrant for using the value-in-use approach to determine fair market value under the record made at trial. Defendant's method of valuation is not credible.
 
 
 52
 The court then set forth its analysis and definition of fair market value of the improvements and equipment under Michigan law:
 
 
 53
 a. the highest price estimated in terms of money that the property will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all of the uses and purposes to which it is adapted and for which it is capable of being used.
 
 
 54
 b. the amount which the property would bring if it were offered for sale by one who desired, but was not obligated, to sell and was bought by one who was willing, but not obliged, to buy.
 
 
 55
 c. what the property would bring in the hands of a prudent seller, at liberty to fix the time and conditions of sale.
 
 
 56
 d. what the property would sell for on negotiations resulting in sale between an owner willing, but not obliged, to sell and a willing buyer not obliged to buy.
 
 
 57
 e. what the property would be reasonably worth on the market for a cash price, allowing a reasonable time within which to effect a sale.
 
 
 58
 Under this analysis, the court found that "the leasehold improvements have no value. They cannot be removed and, therefore, cannot be sold. There is simply no market for something which cannot be marketed." At the same time, the court found the fair market value of the movable equipment to be $13,835.00.
 
 
 59
 Papo contends that the district judge ignored the parties' true intent when he found no fair market value of the leasehold improvements. Furthermore, Papo relies on Olga's initial proposal to purchase the leasehold improvements for approximately $20,312.00 as an indication that the parties intended for fair market value to be greater than liquidation value.[8] Although those arguments have some force, Papo exposed himself to this risk by not specifying in the lease agreement how the equipment and improvements were to be valuated, and by not testifying at trial as to his intent. The record supports the district judge's conclusion that the improvements had no value under the Michigan definition of fair market value. Judge Cohn's finding that the parties' lease arrangement was actually a financing agreement, moreover, undercuts Papo's argument that the leasehold improvements had substantial value at the conclusion of the lease term. As a financing arrangement, Papo had recouped his initial investment with a 16% return together with tax benefits over the five years of the term.
 
 
 60
 Underlying Judge Cohn's analysis is a reasoned belief that the parties did not formulate a true lease. Looking at the substance of the arrangement, the court reasonably could conclude that the parties entered a financing arrangement in which Dr. Papo, an investor and not a dealer in restaurant equipment, would put up the funds to set up Olga's restaurant in the Hayward mall and receive a fixed 16% return on this investment.
 
 
 61
 Courts are often called on to look beyond form and into the substance of an agreement. In many leasing contexts, courts determine that a true lease was not intended; rather the parties sought to clothe their financing agreement in terms of a lease to garner various tax benefits. Judge Cohn recognized that Papo's interpretation of the agreement, if adopted, would result in an apparent windfall. We find no demonstrated error in the district judge's interpretation and in his determination of fair market value, although we might have reached the higher appraisal figure suggested by plaintiff if asked to make a de novo determination.
 
 III. ALLEGED BIAS
 
 62
 Papo's counsel charges that Judge Cohn acted improperly throughout the proceedings, manifesting bias against Papo and his attorneys. The trial judge chastised Papo's counsel for inconsistencies, ineptitude, discovery abuses, and for his conduct of the trial. Papo calls our attention to Nicodemus v. Chrysler Corp., 596 F.2d 152 (6th Cir.1979), and Knapp v. Kinsey, 232 F.2d 458 (6th Cir.), cert. denied, 352 U.S. 892 (1956), in requesting a new trial.
 
 
 63
 We first note that Papo's counsel did not seek a motion for Judge Cohn's recusal pursuant to 28 U.S.C. Sec. 144. Reversal of an action based upon judicial conduct during the proceedings of a case occurs only when the trial judge's comments are both unsupported by the record and unnecessary and prejudicial in the circumstances. See Nicodemus, 596 F.2d at 155. A fair reading of this record indicates that Judge Cohn's remarks demonstrated his impatience due to counsel's lack of preparation, his inept handling of the case, including unwillingness to abide by discovery rules, and his questionable legal arguments.
 
 
 64
 Judge Cohn did not evidence bias by asking pointed questions about the actual nature of the arrangement he was to interpret despite its characterization as a lease. Although the trial judge is to function as a neutral decision maker, and every litigant is entitled to a fair trial, under all the circumstances we find no merit in Papo's claims of judicial bias.
 
 
 65
 We reach this result being mindful of this court's admonition, made more than thirty years ago in Knapp v. Kinsey:
 
 
 66
 The trial judge in the federal court is more than a mere arbitrator to rule upon objections and to instruct the jury. It is his function to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. It is his duty to see that the issues are not obscured and that the testimony is not misunderstood. He has the right to interrogate witnesses for this purpose.
 
 
 67
 However, the right of the trial judge to participate in the proceedings and to interrogate witnesses is not an unlimited one. Such participation should be exercised in conformity with the standards governing the judicial office. The judge should exercise self-restraint and preserve an atmoshpere of impartiality.
 
 
 68
 232 F.2d at 466 (citations omitted).
 
 
 69
 We find no demonstrated hostility towards defendant nor an alignment of the court with plaintiff, as was clearly the case in Knapp, to warrant a new trial.
 
 IV. SANCTIONS
 
 70
 We recite some of the procedural history to indicate the circumstances in which sanctions were imposed following the initial entry of default and its subsequent setting aside on defendant's motion.
 
 
 71
 Dr. Papo and his counsel also appeal the district court's imposition of $22,677.46 in sanctions pursuant to Federal Rules of Civil Procedure 11 and 54, and also 28 U.S.C. Sec. 1920, $1,000 of which was directed to be payable to the clerk of the court. Judge Cohn imposed these sanctions because of positions defendant took in pleadings and at trial as well as discovery abuses and generally dilatory conduct. Olga's Kitchen of Hayward, Inc. v. Papo, 108 F.R.D. 695 (E.D.Mich.1985) (discussing the conduct in detail).
 
 
 72
 On April 11, 1984, plaintiff served interrogatories on defendant, but defendant declined to respond. On July 18, 1984, plaintiff obtained a court order compelling Papo to respond within fifteen days. Despite the court order, defendant failed to submit the mandated interrogatory responses until October 5, 1984.
 
 
 73
 During early February of 1984, plaintiff requested production of certain documents in Papo's custody. Plaintiff received no response from defendant on these requests until after plaintiff had filed a motion to compel production of these documents three days before trial.
 
 
 74
 The district court mandated in a pretrial order that trial briefs be submitted five days before trial. Defendant did not submit its trial brief until the day of trial.
 
 
 75
 At trial and in his pretrial brief, defendant for the first time raised certain issues and challenged Olga's standing under the option. Similarly, defendant challenged the legal sufficiency of plaintiff's purported tender for the first time in its last minute pretrial brief and at trial. Other difficulties arose with defendant's counsel during the course of the bench trial. Defense counsel's failure to submit copies of certain exhibits to plaintiff's counsel by way of discovery before commencement of trial resulted in both aggravation and tedious delay during the trial. It became manifest also during trial that no one in defendant's organization had ever calculated the amount due from plaintiff in interest on the date the lease expired and until trial. The following colloquy then took place:
 
 
 76
 MR. JACOB (defendant's counsel): Your Honor, there is one thing I would like a record on in this case. The Court made some rather disparaging remarks about preparation of the case to both counsel, and perhaps the Court at the conclusion of trial may find those remarks to be inappropriate. We haven't put our case in yet.
 
 
 77
 THE COURT: Sir, I want to tell you something, whether my remarks were well founded or not, your comments that the first time you sat down and calculated the rent and interest payment delinquency was the morning of trial, and the first time you prepared these kind of exhibits was the morning of trial is proof that my statement was absolutely correct.
 
 
 78
 Now we will end it at that, sir. You take an exception to the Court's remark and I understand what you are saying and I stand by my comments.
 
 
 79
 You came into this Court late, Mr. Jacob. This case was as poorly prepared from the Defendant's standpoint as any case in the five years that I have been a Judge that I have been privileged to try. The Defendant failed to make discovery repeatedly and you are very fortunate that this case wasn't dismissed as a cause of action against the Defendant.
 
 
 80
 You came into this case on Friday. You are doing a good job. Leave it at that.
 
 
 81
 MR. JACOB: I thought you were directing it to me personally.
 
 
 82
 As stated, the court ultimately entered judgment on June 14, 1985 essentially in plaintiff's favor. Plaintiff then filed an application for costs and attorneys' fees arising from defendant's conduct throughout the course of the proceedings, seeking $24,082.50 in attorneys' fees and $6,012.66 in costs. Essentially, plaintiff sought reimbursement for the total hours spent on this case.
 
 
 83
 Defendant filed its response in opposition to plaintiff's fee petition and then filed an additional brief in which, three months after trial, defendant claimed for the first time in the course of these proceedings that an oral agreement existed between Olga's and Dr. Papo in which the mall lease was given as security for the leasing agreement.
 
 
 84
 Judge Cohn convened a hearing on plaintiff's fee/costs petition. Much of the focus at the hearing was whether defendant had a reasonable basis in fact or law at the time the answer and counterclaim were filed in seeking $350,000.00 as the fair market value for the equipment and leasehold improvements and the reasonableness of defendant's attorneys in persisting with that position throughout trial.
 
 
 85
 On December 18, 1985, Judge Cohn filed an opinion and order, imposing sanctions and costs against defendant and his counsel jointly in the sum of $21,677.46[9] to be paid to Olga's and additionally the district court imposed a $1000.00 sanction against defendant and his counsel to be paid to the clerk of the court.
 
 
 86
 Defendant and his counsel now appeal.
 
 A. Award of Rule 11 Sanctions
 
 87
 The 1983 amendments to Fed.R.Civ.P. 11[10] were devised to "reduce the reluctance of courts to impose sanctions." Fed.R.Civ.P. 11 advisory committee note. Unlike the previous rules, neither subjective bad faith nor willfullness must be shown before imposing Rule 11 sanctions. See, e.g., Westmoreland v. CBS, Inc., 770 F.2d 1168, 1177 (D.C.Cir.1985); Eastway Construction Corp. v. City of New York, 762 F.2d 243, 253-54 (2d Cir.1985). The Rule sets forth three circumstances mandating imposition of sanctions:
 
 
 88
 The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
 
 
 89
 Fed.Rule Civ.P. 11. Rule 11 contemplates that counsel's conduct will be measured by an objective standard of reasonableness under the totality of the circumstances. See, e.g., Albright v. Upjohn Co., 788 F.2d 1217, 1221 (6th Cir.1986); Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 540 (3d Cir.1985); Rodgers v. Lincoln Towing Service, Inc., 771 F.2d 194, 205 (7th Cir.1985); Westmoreland, 770 F.2d at 1177; Davis v. Veslan Enterprises, 765 F.2d 494, 497 (5th Cir.1985); Eastway, 762 F.2d at 253-54. Accord Fed.R.Civ.P. 11 advisory committee note. Cf. Albright, 788 F.2d at 1222 n. 1 (Guy, J., dissenting) ("The parties and the court are in agreement that the standard used in evaluating an alleged Rule 11 violation is an objective one. Therefore, a court does not need to find willfulness as such. However, the trial court's analysis of where the alleged offending party's conduct falls on a continium ranging from simple negligence to willfulness will undoubtedly be part of the equation."). See also Schwarzer, Sanctions Under the New Federal Rule 11--A Closer Look, 104 F.R.D. 181, 196 (1985).
 
 
 90
 The district court is given discretion in ascertaining whether counsel's submission of any pleading or motion violated Rule 11's duty of reasonableness. The advisory committee note to Rule 11 cautions a district judge not to abuse that discretion "by using the wisdom of hindsight." Rather the trial judge "should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed.R.Civ.P. 11 advisory committee note. See also Eavenson, 775 F.2d at 540-41. The district judge must be given wide discretion because he "has tasted the flavor of the litigation and is in the best position to make these kinds of determinations".[11] Westmoreland, 770 F.2d at 1174, 1175.
 
 
 91
 Once the district court concludes that counsel has failed to satisfy the Rule 11 standard, it may (or even must) impose some type of sanction, using a wide measure of discretion. See Albright, 788 F.2d at 1222; Westmoreland, 770 F.2d at 1174-75; Eastway, 762 F.2d at 254 n. 7.
 
 
 92
 The district court found defendant's and his counsel's conduct to be unreasonable in several instances. First, the court found lacking in a reasonable factual or legal basis Papo's assertion in his answer and counterclaim and his trial argument that the fair market value of the equipment and leasehold improvements was $350,000.00:
 
 
 93
 What was needed in January of 1984, at the time Papo finally filed his answers to the complaint and the counterclaim, was the appraisal that was not made until the fall of 1984. The facts as I have described them establish a violation of Rule 11 on the issue of valuation. There was no reasonable inquiry made prior to the filing of the counterclaim. It is not necessary that I "scrutinize the unfathomable processes of [counsel's] mind." Mohammed v. Union Carbide Corp., [606 F.Supp. 260, 261 (E.D.Mich.1985) ]
 
 
 94
 ....
 
 
 95
 The affidavit, however, does have some efficacy; it appears to implicate Papo in the ungrounded position advanced by his pleadings. Contrary to his attorneys' contention that Papo's beliefs were unknown, the affidavit appears to show that Papo played a real role in this case. As such, Papo himself may be held liable along with his attorneys for the violation of Rule 11.
 
 
 96
 That Olga's initially put a value on the leasehold improvements, while I found they had no market value, does not support Papo's contention that Olga's could not have incurred any additional expenses in resisting Papo's $350,000.00 figure. Whether Olga's initially advanced a "no value" figure or the figure it initially presented, it would still have incurred unnecessary expenses in challenging Papo's unsupportable valuation.
 
 
 97
 I am not sanctioning Papo and his attorneys simply for advancing a position that was eventually unsuccessful on the merits. Considering the true nature of the transaction between the parties, as more fully described in the Opinion, no court could reasonably have found that Papo was entitled to $350,000.00 in exchange for plaintiff's keeping possession of the leasehold improvements and equipment at the end of the five year term.
 
 
 98
 Papo places a good deal of weight on a separate case between the parties as justifying the reasonableness of his position in this case. Papo is wrong. The decision in Papo v. Aglo Restaurants of San Jose, Inc., Oakland County Circuit Court Case No. 80-202639-CZ, Opinion and Order of June 29, 1984, actually supports my conclusion as to the unreasonableness of Papo's position in this case.
 
 
 99
 ....
 
 
 100
 ... Additionally, it should be recognized that the state court decision was handed down some six months after the answer and counterclaim were filed, and Papo made no change in his position in this case following June 29, 1984. On the contrary, it appears that Papo's appraiser was specifically instructed to use value-in-use in November, 1984, presumably in recognition that the valuation by Olga's in this case was consistent with the findings in the state court decision. Importantly, the state court accepted the appraisal figures of the expert for Olga's.
 
 
 101
 108 F.R.D. at 704-07.
 
 
 102
 Judge Cohn determined that defendant's position on the fair market value of the equipment and leasehold improvement lacked a reasonable factual or legal basis from its inception and throughout the course of the proceedings. We find this to be a close question, and we would find only nominal imposition of sanctions at best to be warranted in this regard.
 
 
 103
 Judge Cohn also addressed whether defendant acted reasonably in claiming in its answer and counterclaim that Olga's could not lawfully exercise the option because it was in default and further that Olga's had converted the equipment at the expiration of the lease owing Papo holdover rent for continued use of the equipment. In his opinion on the merits of this action, Judge Cohn found the default argument to be an "afterthought." In the sanction action, Judge Cohn found that contention worthy of sanction and also sanctioned defendant for its theory of conversion and holdover tenancy.
 
 
 104
 Imposing sanctions on this account would seem to foreclose defendant from raising standard defenses to a purported exercise of an option. It is not unusual for lessors-investors to defend against actions for specific performance of options by claiming deficiencies in tender or lessee's default in making lease payments when the lease contains a no waiver clause. Substantial authority holds that "no waiver" clauses cannot be waived, and Michigan has not clearly resolved that issue. Although defendant's conduct when plaintiff sought to exercise the option was inconsistent with the no waiver clause, we deem it unwarranted to sanction defendant for making this type of defense asserting a legitimate claim on the basis of a written document. Defendant did not act unreasonably in asserting plaintiff's default and inadequate tender as defense, and his claim for conversion and holdover rent simply was not baseless or unreasonable.
 
 
 105
 Papo's reliance on the state court judgment also to some extent supports the reasonableness of his position. The state trial court did hold that Papo was entitled to holdover rent based upon the lease rent agreement for the equipment only, not on the leasehold improvements. After the actions in the district court concluded, the Michigan Court of Appeals reversed the state trial court's calculation of damages, finding that Papo was entitled only to the reasonable rental value of the equipment. Thus the state trial court opinion does support defendant's holdover rent analysis to a certain degree, but defendant Papo should have considered altering his position on the amount of rent he could reasonably expect for Olga's continued possession after the trial court opinion was reversed. We conclude in this respect that the district judge abused his discretion in imposing sanctions for maintaining its conclusion that Papo lacked a reasonable factual or legal basis for the default and holdover rent arguments.
 
 
 106
 The court also sanctioned Papo and counsel for seeking one million dollars in punitive damages for its "conversion" action when Michigan law had plainly repudiated an award of punitive damages in actions concerning breach of a commercial contract. Because Michigan has precluded such damages in commercial breach of contract contexts, defendant lacked any legal basis for that counterclaim. A modest sanction may well have been imposed for this position.
 
 
 107
 Finally, the court levied sanctions against Papo and his attorneys for violating Federal Rules of Civil Procedure 16 and 37(b)(2) by not complying with the court's orders to compel discovery, stating:
 
 
 108
 Olga's claims attorney's fees for violations of Federal Rules of Civil Procedure 16 and 26 occasioned by Papo's general pretrial and discovery conduct. Specifically, Olga's points out that a default was entered on January 3, 1984 for Papo's failure to answer the complaint. Olga's moved for entry of a default judgment on January 17, 1984, but stipulated to withdraw the default when Papo agreed to answer. Olga's also served interrogatories on Papo on April 11, 1984. When Papo did not answer or object by May 25, 1984, Olga's moved to compel a response. I issued an order to compel on July 18, 1984, giving Papo fifteen days to respond. The answers were not filed until October 5, 1984.
 
 
 109
 In response, Papo says that Olga's has alleged no action or inaction on his part that violates the rules. This is not true. Papo was more than two months late in complying with the order of July 18, 1984, requiring answers to Olga's interrogatories under Rule 37(a)(2). This is a violation of Rule 37(b)(2), for failure to "obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule...." It is also a violation of a pretrial order under Rule 16.
 
 
 110
 In my order of July 18, 1984, I reserved the right to impose sanctions. The lateness of Papo's answers clearly justifies the imposition of a monetary sanction for failure to comply with the order. Papo has not shown substantial justification for the failure to timely obey the order or other circumstances that would make an award of expenses unjust; instead, Papo contends that he obeyed the order because he eventually submitted answers.
 
 
 111
 The general indifference of Papo's attorney to the discovery rules, as I noted in the Opinion, also supports a sanction under Rule 37(b).... [The] "actions and inactions by plaintiff which, when viewed as a whole can only be characterized as a repeated and flagrant disregard for ... the orders of this Court and the requirements of the discovery process" [are grounds for dismissal under Rule 37(b) ].
 
 
 112
 108 F.R.D. at 708. Papo does not challenge the district court's conclusion that sanctions were appropriate for the discovery abuse. Rather, Papo claims that the amount of sanctions was unreasonable because plaintiff was not prejudiced.
 
 
 113
 Defendant's course of conduct in this action may also suggest that he acted for wrong purposes, i.e., to cause delay or to harass plaintiff by asserting groundless claims, but while sanctions were mandated under Rule 11, see, Albright v. Upjohn, 788 F.2d 1217, 1221-22 (6th Cir.1986), we find the amount of sanctions under the circumstances to be excessive.
 
 B. Reasonableness of the Sanctions
 
 114
 Papo contends that imposition upon him of $14,167.50 in attorneys' fees and costs is unreasonable and excessive, contravening Rule 11's mandate. Our review of the amount of sanctions, however, is restricted to an abuse of discretion standard.
 
 
 115
 In exercising its discretion in awarding reasonable fees and costs, a district court must consider Rule 11's goals to deter and punish offenders and to compensate victims for expenditures of time and resources in responding to unreasonable pleadings or motions. See, e.g., Westmoreland, 770 F.2d at 1179-80; Itel Containers International Corp. v. Puerto Rico Marine Management, Inc., 108 F.R.D. 96, 104-07 (D.N.J.1985); United Food & Commercial Workers Union, Local No. 115 v. Armour & Co., 106 F.R.D. 345, 348-49 (N.D.Cal.1985); Taylor v. Prudential-Bache Securities, Inc., 594 F.Supp. 226, 229 (N.D.N.Y.) aff'd without opinion, 751 F.2d 371 (1984)); see generally Schwarzer, supra, 104 F.R.D. at 201. Furthermore, the district court should not assume that "reasonable" means actual fees. See, e.g., In re TCI, Ltd., 769 F.2d 441, 448-49 (7th Cir.1985); Local No. 115, 106 F.R.D. at 349; see generally Schwarzer, supra, 104 F.R.D. at 203. Thus fees sought by plaintiff's counsel may be awarded only if deemed reasonably necessary to defend against unwarranted and meritless actions of the opponent. When counsel is called upon to defend against its opponent's unreasonable filings, it must mitigate damages by not claiming an excessive amount of hours and funds in responding to patently unmeritorious claims or positions. The mitigation requirement prevents a party from abusing Rule 11 sanctions to benefit from opposing counsel's mistakes, errors or overly aggressive claims. "The rule's purpose would be frustrated if it encouraged the offended party to play the very game at which it is aimed." Schwarzer, supra, 104 F.R.D. at 201; see also TCI, 769 F.2d at 448-49; Local No. 115, 106 F.R.D. at 349-50. Compensation to the "victim" is a factor to be considered in awarding Rule 11 sanctions, but courts and commentators have stressed that the Rule is intended to "penaliz[e] the offender to achieve special and general deterrence." Schwarzer, 104 F.R.D. at 201 (1985); Westmoreland, 770 F.2d at 1180. The district court must therefore balance carefully these interests in making a determination of sanctions.
 
 
 116
 Defendant contends that even if the district court properly determined that Rule 11 mandated sanctions, the amount the court awarded, was excessive and unreasonable. Viewing Rule 11 sanctions as primarily a mode of compensating the opposing party, defendant urges the court to reject as excessive the district court's award because plaintiff was not prejudiced by defendant's actions and because plaintiff failed to mitigate damages by not seeking an earlier resolution of defendant's "meritless" issues by a status conference or motions to dismiss or for summary judgment. Papo and counsel do not, however, challenge the reasonableness of the time spent by Olga's counsel in preparing the case for trial. Defendant also claims that defendant and counsel did not engage in flagrant and willful violations of Rule 11.
 
 
 117
 In sum, the district court did not abuse its discretion in determining that plaintiff was entitled to some fees and costs as sanctions. We have some question about the $1,000 "fine."[12] We conclude, in summary, that the imposition of sanctions should be limited to $16,012.66 in this case.
 
 
 118
 We AFFIRM the district court in its determination of the legal issues resulting in an order directing payment to Papo of $25,711.44 for moveable equipment and delinquent interest. We REVERSE, however, with respect to the amount of sanctions imposed and limit sanctions to be paid to plaintiff by defendant and his counsel in fees and costs of $16,012.66.
 
 
 
 *
 The Honorable James D. Todd, U.S. District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Olga's had a fifteen year lease with the Hayward Southland Mall for its premises. The mall lease contained fairly restricted conditions that Olga's must satisfy before it can assign its lease to another business
 After the lease was signed, Aglo Restaurants of Hayward changed its corporate name to Olga's Kitchen of California, Inc. "Olga" is "Aglo" spelled backwards. (J/A 187) Testimony indicated that Aglo's was a wholly owned subsidiary of Olga's.
 
 
 [2]
 The cost of the leasehold improvements and equipment was $376,636.00. The equipment for the restaurant cost approximately $113,000.00, and the balance of $246,523.00 was used to improve the leasehold, including legal fees, insurance, general travel permit, construction costs, decor, and opening day preparations
 Nothing in the Hayward premises of Olga California indicated Papo's ownership or interest. There was no list prepared of equipment and leasehold improvements covered and referred to in the lease.
 
 
 [3]
 The lease specified that the term "equipment" meant removable equipment as well as the leasehold improvements
 
 
 [4]
 Despite the fact that the contract was dated June 1, 1978, plaintiff contended that it understood that rent payments were not to begin until July 1, 1978, thus rendering their initial payments timely as to August
 
 
 [5]
 Plaintiff's explanation for the shortfall was the fact that the parties did not know until 1979 the actual cost of the leasehold improvements and equipment
 
 
 [6]
 Affirmation of Olga's right to exercise the option eliminates Papo's contention that Olga's owed rent as a holdover tenant. We need to address Papo's argument on holdover rent
 
 
 [7]
 The state courts reached a similar conclusion with respect to the San Jose leasehold improvements, by awarding fair market value solely for the removable equipment
 
 
 [8]
 Judge Cohn specifically rejected Papo's claims that he applied liquidation value to the leasehold improvements
 
 
 [9]
 The award breaks down as follows:
 Attorneys' fees--$15,911.25 (this amount was less than 2/3 of the amount claimed):
 
 
 [92]
 75 hours at $130.00/hr before and during trial (one-half the time described by Olga's); 26.75 hours at $130.00/hr after trial; 10.75 hours at $35.00/hr (paralegal)
 Costs--$5,766.21
 
 
 [10]
 Fed.R.Civ.P. 11 currently provides in pertinent part:
 Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
 
 
 [11]
 "In determining whether factual (1) or dilatory or bad faith (3) reasons exist which may give rise to invocation of Rule 11 sanctions, the district court is accorded wide discretion.... On the other hand, a decision whether the pleading or motion is legally sufficient (2) involves a question of law and receives this court's de novo review."
 
 
 [12]
 Papo and his counsel raise no objection to the imposition of a $1,000.00 sanction payable directly to the clerk of the court. Judge Schwarzer, however, discusses the potential constitutional questions involving such "fines". Schwarzer, supra, at 202-03